UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 22cr10006 |
| v. | Violations: |
| KRIS BORTNOVSKY, <br> a/k/a "Kris Bort," and <br> RYAN SHAPIRO, | Count One: <br> Conspiracy to Commit Securities Fraud <br> (18 U.S.C. § 1349) |
| Defendants | Count Two: <br> Securities Fraud; Aiding and Abetting <br> (15 U.S.C. §§ 78j(b) and 78ff(a); <br> 17 C.F.R. § 240.10b-5; and <br> 18 U.S.C. § 2) |
| | Forfeiture: <br> 18 U.S.C. § 981(a)(1)(C) and 28 <br> U.S.C. § 2461(c) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1.      Defendant KRIS BORTNOVSKY, also known as "Kris Bort," was a resident, variously, of New York and Florida. BORTNOVSKY was the president and co-founder of Sakal Capital Management, LLC ("Sakal Capital Management"), a privately held asset management firm incorporated in Delaware, and managed the Sakal US Fund LLC ("Sakal US Fund").

2.      Defendant RYAN SHAPIRO was a resident of Florida. SHAPIRO was an entrepreneur and was the founder of Fynd Technologies, Inc. ("Fynd"), a privately held company that manufactured personal tracking devices, and JPay, a privately held company that offered money transfer and other technology-related services to incarcerated individuals.

3. David Schottenstein was a resident of Florida and, at relevant times, was an investor in the Sakal US Fund. Schottenstein was also an investor in Fynd. Schottenstein was a relative of Individual 1 and Individual 2 and had a relationship of trust and confidence with both of them.

4. Individual 1 was, at relevant times, a member of the board of directors of DSW, Inc. ("DSW"), a publicly-traded footwear and accessories retailer based in Columbus, Ohio. Between in or about February 2018 and November 2018, Individual 1 was also a member of the board of directors of Green Growth Brands ("GGB"), a retailer of cannabis-related products also based in Columbus, Ohio. As a member of the boards of directors of both DSW and GGB, Individual 1 owed a fiduciary duty and a duty of trust and confidence to those companies. After November 2018, Individual 1 continued to owe duties of loyalty and confidentiality to GGB commensurate with those owed by the company's directors pursuant to a "Board Observer Agreement" that provided, in relevant part, that he would not use or disclose "any confidential or proprietary information" relating to GGB's "business and affairs." Individual 1 was a close relative of Individual 2 and had a relationship of trust and confidence with Individual 2.

5. Individual 2 was, at relevant times, a member of the boards of directors of both DSW and Albertsons Companies, Inc., a supermarket chain based in Boise, Idaho. In that capacity, Individual 2 owed a fiduciary duty and a duty of trust and confidence to those companies.

6. Individual 3 was a businessman and, with BORTNOVSKY, a co-founder of Sakal Capital Management.

7. Individual 4 was a business partner of Individual 3.

8. Individual 5 was an employee of Sakal Capital Management.

9. Aphria, Inc. ("Aphria") was a producer and distributor of cannabis products based in Leamington, Ontario, Canada. At relevant times, Aphria traded on the New York Stock Exchange ("NYSE") under the ticker symbol APHA and was an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act").

10. At Home Group, Inc. ("At Home"), was a retailer of home décor products based in Plano, Texas that, at relevant times, traded on the NYSE under the ticker symbol HOME and was an issuer with a class of securities registered under Section 12 of the Exchange Act.

11. At relevant times, the shares of DSW traded on the NYSE under the ticker symbol DSW. In or about March 2019, DSW changed its name to Designer Brands, Inc., and its shares have since then traded on the NYSE under the ticker symbol DBI. At relevant times, the company was an issuer with a class of securities registered under Section 12 of the Exchange Act.

12. Kimco Realty Corp. ("Kimco") was a real estate investment trust based in Jericho, New York that, at relevant times, traded on the NYSE under the ticker symbol KIM and was an issuer with a class of securities registered under Section 12 of the Exchange Act. Kimco held an ownership stake in Albertsons.

13. Rite Aid Corp. ("Rite Aid") was a drugstore chain based in Philadelphia, Pennsylvania. At relevant times, Rite Aid traded on the NYSE under the ticker symbol RAD and was an issuer with a class of securities registered under Section 12 of the Exchange Act.

Overview of the Conspiracy and the Scheme to Defraud

14. Beginning no later than August 2017 and continuing through at least May 2019, BORTNOVSKY, SHAPIRO and Schottenstein conspired with each other, and with others known and unknown to the Grand Jury, to obtain material non-public information ("MNPI") about the

financial performance and merger-and-acquisition activity of various publicly-traded companies and to execute securities trades while in possession of that MNPI.

### Object and Purpose of the Conspiracy

15. The object of the conspiracy was to commit securities fraud by trading in the securities of various companies while in possession of MNPI about those companies. The principal purposes of the conspiracy were to make money and to conceal the conspirators' actions from others, including regulators, law enforcement, and Individual 1.

### Manner and Means of the Conspiracy and the Scheme to Defraud

16. Among the manner and means by which BORTNOVSKY, SHAPIRO, Schottenstein, and others known and unknown to the Grand Jury carried out the conspiracy and the scheme to defraud were the following:

   a. Obtaining and sharing with each other MNPI about various companies, including but not limited to companies with which Individual 1 or Individual 2 were affiliated as major investors and board members, or about which they otherwise had confidential business information;

   b. Trading in the securities of those companies while in possession of that MNPI, in violation of the duties of trust and confidence the conspirators owed to the sources of the information, or that the sources owed the companies; and

   c. Taking steps to conceal the scheme from regulators, law enforcement, and others, including by communicating about the MNPI in person or using coded language.

Acts in Furtherance of the Conspiracy and the Scheme to Defraud

17. Beginning no later than in or about August 2017 and continuing through at least May 2019, BORTNOVSKY and SHAPIRO, together with Schottenstein and others known and unknown to the Grand Jury, committed and caused to be committed the following acts, among others, in furtherance of the conspiracy and the scheme to defraud:

18. In or about August 2017, prior to the public announcement of DSW's second quarter 2017 earnings, Schottenstein called Individual 1, who was a member of DSW's board of directors, to solicit inside information about DSW's financial performance. Individual 1 told Schottenstein, in substance, that DSW was performing well financially, and noted at one point that the company was "crushing it."

19. While in possession of MNPI about DSW's financial performance that Schottenstein had obtained from Individual 1, Schottenstein purchased securities of DSW. For example, on or about August 15, 2017, Schottenstein purchased thousands of DSW shares. Schottenstein also purchased hundreds of DSW call option contracts through Fidelity Capital Markets, a Boston, Massachusetts-based trading unit of Fidelity Investments ("Fidelity"), a brokerage and financial services firm.

20. On or about that same day, August 15, 2017, Schottenstein called BORTNOVSKY to discuss MNPI Schottenstein had obtained from Individual 1, and BORTNOVSKY caused the Sakal US Fund to purchase at least 35,000 DSW shares.

21. Also on or about that same day, Schottenstein and BORTNOVSKY exchanged messages intended to conceal their fraud by falsely claiming that they were not trading on the basis of MNPI. Schottenstein wrote: "[T]o be clear and for the record I don't have any sort of special

5

insight or info or anything like that. Just a feeling[.]" BORTNOVSKY responded: "I didn't think anything different[.]" The messages were false because, as BORTNOVSKY and Schottenstein both knew, they were in possession of MNPI about DSW's financial performance that Schottenstein had obtained from Individual 1 and shared with BORTNOVSKY in violation of Schottenstein's duty of trust and confidence to Individual 1.

22. As another example, on or about August 18, 2017, after exchanging multiple calls with Individual 1—and while in possession of MNPI about DSW's financial performance Schottenstein had obtained from Individual 1—Schottenstein purchased additional DSW shares and call options, including through Fidelity's trading operations in Boston, Massachusetts.

23. On or about that same day, August 18, 2017, while in possession of MNPI about DSW's financial performance obtained from Schottenstein, BORTNOVSKY caused the Sakal US Fund to purchase tens of thousands of additional DSW shares for approximately $2 million.

24. On or about August 21, 2017, BORTNOVSKY borrowed $300,000 from a close relative and $600,000 from Individual 3, and used those funds to purchase additional DSW shares in his personal account.

25. On or about that same day, August 21, 2017, BORTNOVSKY caused Sakal Capital Management and the Sakal US Fund to purchase additional DSW securities, and also caused the purchase of tens of thousands of additional DSW shares in an account BORTNOVSKY managed for Individual 4.

26. On or about August 22, 2017 and August 23, 2017, after DSW announced strong quarterly financial results for the second quarter of 2017, BORTNOVSKY and Schottenstein sold all the DSW shares and securities they had acquired in their personal accounts, and

BORTNOVSKY also caused the sale of all the DSW shares and securities he had caused Sakal Capital Management, the Sakal US Fund, and Individual 4 to acquire, earning combined profits of approximately $2 million.

27. On or about August 23, 2017, BORTNOVSKY wired back to Individual 3 the $600,000 he had borrowed two days earlier.

28. On or about that same date, August 23, 2017—prior to the public announcement of At Home's quarterly earnings after the market closed on September 5, 2017—BORTNOVSKY told Schottenstein, in substance, that At Home would report strong earnings and emailed Schottenstein news articles reporting that analysts at two Wall Street firms were optimistic about At Home's stock price. Schottenstein responded, "Crap. So it's gonna be tough to buy cheaper than what it's at now." BORTNOVSKY replied, "You don't know that."

29. On or about August 28, 2017, Schottenstein purchased 10,000 shares of At Home, and BORTNOVSKY also began purchasing At Home shares and call options.

30. Beginning on or about August 31, 2017 and continuing over the next several days, Schottenstein shared the information about At Home's financial performance with SHAPIRO so that SHAPIRO could trade on it. On that date, for example, Schottenstein messaged SHAPIRO: "Tomorrow, I want you to buy $500k-$1m of HOME, with a limit of $24.65." Schottenstein later added: "Don't worry no rush re buy, u have 2 days"—referring to the fact that At Home's earnings would not be reported until after the market closed two business days later.

31. On or about that same date, August 31, 2017, Schottenstein purchased approximately 99,000 shares of Rite Aid after learning from Individual 1 that Albertsons was planning to acquire the company.

7

32. On or about September 1, 2017, Schottenstein messaged SHAPIRO: "And just so we are super clear and it's on the record I do not have any inside information or any non-public information. My recommendations are strictly based on whatever research I do or the people I trade with do. Would never trade on inside info, not to mention I have never had any." SHAPIRO responded: "Great me neither."

33. On or about that same day, September 1, 2017, and again on September 5, 2017, SHAPIRO purchased thousands of shares of At Home, investing a total of approximately $500,000, as Schottenstein had directed.

34. On or about September 6, 2017, after At Home's share price declined despite reporting strong quarterly earnings after the market closed the prior day, Schottenstein messaged SHAPIRO: "Trust me here. Do NOT sell. I will call you soon. Once I land."

35. On or about that same day, September 6, 2017, during an in-person meeting at BORTNOVSKY's apartment in New York City, BORTNOVSKY told Schottenstein that BORTNOVSKY was close to a board member of At Home who had told him that the company was going to be acquired.

36. Schottenstein subsequently relayed the information BORTNOVSKY had provided to SHAPIRO.

37. On or about September 11, 2017, with At Home's share price still languishing, Schottenstein messaged SHAPIRO: "Just sit tight and wait for the takeout." Schottenstein also told SHAPIRO: "U also might wanna consider $500k of RAD," and promised to "fill [SHAPIRO] in on everything" during an in-person meeting on Friday, September 15, 2017.

38. On or about that same day, September 11, 2017, BORTNOVSKY offered to assume the risk of any decline in the value of SHAPIRO's investment in At Home in exchange for half of any increase in the shares' value.

39. On or about September 13, 2017, SHAPIRO accepted BORTNOVSKY's offer.

40. Between on or about September 15, 2017 and on or about February 20, 2018, Schottenstein continued to obtain MNPI about Albertsons' plans to acquire Rite Aid from Individual 1 pursuant to their relationship of trust and confidence, and to share that information with BORTNOVSKY and SHAPIRO. During that same period, Schottenstein, BORTNOVSKY and SHAPIRO discussed the fact that the expected acquisition would benefit Kimco, which owned a stake in Albertsons.

41. On or about September 19, 2017—while in possession of MNPI about Albertsons' plans to acquire Rite Aid that, as BORTNOVSKY knew, Schottenstein had shared with BORTNOVSKY in violation of the duty of trust and confidence Schottenstein owed Individual 1—BORTNOVSKY purchased 5,000 Rite Aid call options in his personal brokerage account.

42. On or about November 30, 2017, Schottenstein instructed SHAPIRO to sell his At Home shares.

43. On or about that same day, SHAPIRO sold the At Home shares he had previously acquired and wired $18,000 to BORTNOVSKY.

44. On or about February 14, 2018, while in possession of MNPI about Albertsons' plans to acquire Rite Aid, Schottenstein messaged BORTNOVSKY that he had acquired shares of Kimco, and BORTNOVSKY caused the Sakal US Fund to acquire approximately 250,000 shares of Rite Aid.

45.     On or about February 16, 2018—while in possession of MNPI about Albertsons' plans to acquire Rite Aid that, as SHAPIRO knew, Schottenstein had shared with SHAPIRO in violation of the duty of trust and confidence Schottenstein owed Individual 1—SHAPIRO caused a trust account he controlled to purchased tens of thousands of shares of Rite Aid and more than 6,500 shares of Kimco.

46.     On or about Sunday, February 18, 2018, Schottenstein messaged BORTNOVSKY, "Talk to u Tuesday," and sent him a photo depicting a Rite Aid Pharmacy sign. BORTNOVSKY responded, "That's a sign."

47.     On or about Tuesday, February 20, 2018, after the Wall Street Journal reported that Albertsons planned to acquire Rite Aid, SHAPIRO messaged Schottenstein: "[D]id you see the beautiful headline in the wsj." Schottenstein replied, "Been up since 5."

48.     On or about that same day, February 20, 2018, Schottenstein and SHAPIRO sold tens of thousands of Rite Aid shares.

49.     In or about December 2018, after learning from Individual 1 that GGB was planning to launch a hostile acquisition bid for Aphria, Schottenstein acquired shares of Aphria in his personal accounts and shared the MNPI about GGB's plans with BORTNOVSKY and SHAPIRO so that they could also acquire Aphria shares.

50.     For example, on or about December 14, 2018, after meeting with Individual 1 and obtaining information about GGB's plans, Schottenstein caused a close relative with trading authority over one of Schottenstein's brokerage accounts to acquire tens of thousands of Aphria shares in that account, and also made plans to meet with BORTNOVSKY and SHAPIRO.

51. Schottenstein met separately with BORTNOVSKY and SHAPIRO on or about December 18, 2018, and shared MNPI with them concerning GGB's acquisition plans that, as both BORTNOVSKY and SHAPIRO knew, Schottenstein had obtained from Individual 1 pursuant to their relationship of trust and confidence.

52. On or about that same day, December 18, 2018, SHAPIRO caused a trust account he controlled to acquire tens of thousands of Aphria shares, and BORTNOVSKY caused the Sakal US Fund to acquire thousands of Aphria stock options.

53. On or about the afternoon of December 27, 2018, minutes after receiving a copy from Individual 1 of a GGB press release announcing the company's bid for Aphria, Schottenstein messaged SHAPIRO: "Callllll me."

54. On or about the morning of December 28, 2018, after Aphria publicly rejected the GGB bid, Schottenstein learned from Individual 1 that there would be no change to GGB's bid for Aphria.

55. Within minutes, Schottenstein messaged SHAPIRO and BORTNOVSKY successively. Schottenstein told SHAPIRO: "sit tight. Don't do anything." Schottenstein told BORTNOVSKY: "I don't think I'd sell less than $8. I think they'll prob have to increase offer, plus I think shorts will have to cover plus I think maybe others will bid." Schottenstein then told SHAPIRO: "I think they'll prob have to increase offer, plus I think shorts will have to cover plus I think maybe others will bid."

56. On or about the same day, December 28, 2018, as Aphria's share price increased in the wake of GGB's hostile bid, BORTNOVSKY caused the Sakal US Fund to sell thousands of Aphria securities for total proceeds of nearly $900,000.

57.     On or about January 10, 2019, Schottenstein sold more than 75,000 Aphria shares in his personal accounts and instructed SHAPIRO to "sell u know what pls."

58.     On or about that same date, January 10, 2019, SHAPIRO sold 87,000 Aphria shares in the trust account he controlled, and BORTNOVSKY caused the Sakal US Fund to sell nearly 200,000 Aphria shares and approximately 1,500 Aphria call option contracts for total proceeds of nearly $1.6 million.

59.     Also on or about that date, Schottenstein messaged SHAPIRO, "What did we get? $6.80?" SHAPIRO responded, "$6.782. Around 90k."

60.     On or about the following day, January 11, 2019, BORTNOVSKY caused the Sakal US Fund to sell its remaining Aphria shares and call option contracts for total proceeds of approximately $4.6 million.

61.     On or about May 22, 2019, SHAPIRO forwarded Schottenstein an email reflecting that he had earned gains totaling approximately $175,000 in Aphria and At Home, and had incurred a loss of nearly $120,000 on another security Schottenstein had recommended without relying on MNPI. Schottenstein responded by requesting that SHAPIRO donate, on Schottenstein's behalf, Schottenstein's half of the net profits from SHAPIRO's trading based on Schottenstein's tips to the synagogue that Schottenstein and SHAPIRO attended, and noted that SHAPIRO would thereby "get the deduction."

COUNT ONE
Conspiracy to Commit Securities Fraud
(18 U.S.C. § 1349)

The Grand Jury charges:

62. The Grand Jury re-alleges and incorporates by reference paragraphs 1-61 of this Indictment.

63. From in or about August 2017 through at least May 2019, in the District of Massachusetts and elsewhere, the defendants,

KRIS BORTNOVSKY,
a/k/a "Kris Bort," and
RYAN SHAPIRO,

conspired with each other, with David Schottenstein, and with others known and unknown to the Grand Jury, to commit securities fraud, that is, to knowingly execute and attempt to execute a scheme and artifice (a) to defraud persons in connection with securities of issuers with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, including DSW, Inc., also known as Designer Brands, Inc., At Home Group, Inc., Aphria, Inc., Rite Aid Corp., and Kimco Realty Corp.; and (b) to obtain, by means of false and fraudulent pretenses, representations and promises, money and property in connection with the purchase and sale of securities of issuers with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, including DSW, Inc., also known as Designer Brands, Inc., At Home Group, Inc., Aphria, Inc., Rite Aid Corp., and Kimco Realty Corp., in that BORTNOVSKY and SHAPIRO traded in the securities of those companies while in possession of material non-public information, in violation of Title 18, United States Code, Section 1348.

All in violation of Title 18, United States Code, Section 1349.

<u>COUNT TWO</u>
Securities Fraud; Aiding and Abetting
(15 U.S.C. §§ 78j(b) and 78ff(a); 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2)

64. The Grand Jury re-alleges and incorporates by reference paragraphs 1-61 of this Indictment.

65. From in or about August 2017 through in or about January 2019, in the District of Massachusetts and elsewhere, the defendants,

KRIS BORTNOVSKY,
a/k/a "Kris Bort," and
RYAN SHAPIRO,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase or sale of securities in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit in connection with the purchase and sale of securities, to wit: securities of DSW, Inc., also known as Designer Brands Inc., At Home Group, Inc., Aphria, Inc., Rite Aid Corp., and Kimco Realty Corp.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

14

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

66. Upon conviction of one or more of the offenses charged in Counts One and Two, the defendants,

KRIS BORTNOVSKY,
a/k/a "Kris Bort," and
RYAN SHAPIRO,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

67. If any of the property described in Paragraph 66, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 66 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

*Maria Piccolomini*
FOREPERSON

STEPHEN E. FRANK
SETH B. KOSTO
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: January 6, 2022
Returned into the District Court by the Grand Jurors and filed.

/s/ Lisa Belpedio, 2:07 pm
DEPUTY CLERK

16